[No. D034632. Fourth Dist., Div. One. Apr. 5, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
GARY LAWRENCE LABAER, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II. and III.

## COUNSEL

Joël K. Liberson, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Carl H. Horst and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HALLER, J.**—A jury convicted Gary Lawrence Labaer of arson of a structure, arson of the property of another, two counts of battery upon a police officer, and resisting an executive officer. (Pen. Code,[2] §§ 451, subds. (c) & (d), 243, subd. (b), 69.) The court sentenced Labaer to prison for four years on the arson of a structure count, and imposed a five-year probation term for the battery convictions. Labaer appeals.

[2]All further statutory references are to the Penal Code.

In the published portion of the opinion, we conclude substantial evidence supported the jury's implied finding that the subject matter of the fire, a stripped-down mobilehome, was a "structure" within the meaning of section 451, subdivision (c). In the unpublished portion, we hold the trial court erred when it ordered a five-year probation term on the misdemeanor battery convictions. We affirm the judgment, but remand for resentencing on the battery convictions.

## FACTS

Labaer owned a double-wide mobilehome that he kept at RV World, a storage facility. Although the storage contract did not allow him to do so, he frequently stayed in the mobilehome. After Labaer repeatedly failed to pay monthly storage fees, a court declared the mobilehome abandoned and permitted sale of the home and its contents.

Immediately before the public auction began, the auctioneer saw Labaer and several other men disassemble parts of the mobilehome. The men removed trusses from the roof, aluminum siding panels, and sliding glass doors, and loaded the parts on a truck. The auctioneer called the sheriff's department, and sheriff's deputies arrested Labaer on unrelated misdemeanor warrants. While waiting in court, Labaer referred to the mobilehome and said, "I should just burn the damn thing down." Labaer was later released from custody.

At the auction held later that day, RV World, the only bidder, purchased Labaer's mobilehome for $100. The next day, Jeffrey Funk, manager of a nearby nursery, noticed the mobilehome on fire and saw Labaer backing away from the southeast portion. When Deputy Sheriff Roderick MacDonald arrived, Funk identified Labaer as the person who was near the mobilehome when the fire started. Labaer interfered with Deputy MacDonald's investigation of the fire by being hostile and slapping Deputy MacDonald's hand when the deputy reached for Labaer's jacket. When Deputy Sheriff Jonda Hammons directed Labaer to the patrol car, Labaer began pushing and hitting her. After witnessing this and receiving punches from Labaer, Deputy MacDonald placed Labaer in a carotid restraint hold and handcuffed him.

The jury found Labaer guilty of arson of a structure (§ 451, subd. (c)), arson of property of another (§ 451, subd. (d)), two counts of battery upon Deputies MacDonald and Hammons (§ 243, subd. (b)), and resisting an executive officer (§ 69).

## DISCUSSION

### I. *The Mobilehome Was a Structure Within the Meaning of Section 451, Subdivision (c)*

■ Labaer contends the prosecution failed to introduce sufficient evidence that the mobilehome was a "structure" within the meaning of section 451, subdivision (c).

"A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned . . . any structure, forest land or property . . . ." (§ 451.) The arson statutes provide different levels of punishment, depending on the subject matter of the arson. (§ 451.) These statutory categories, in descending level of punishment, are: (1) arson resulting in great bodily injury (five, seven, or nine years); (2) arson to "an inhabited structure or inhabited property" (three, five, or eight years); (3) arson of a "structure or forest land" (two, four, or six years); and (4) arson to other types of property (16 months, two, or three years). (§ 451, subds. (a), (b), (c) & (d).) By creating these different levels of punishment, the Legislature intended to impose punishment " 'in proportion to the seriousness of the offense,' " and, in particular, "according to the injury or potential injury to human life involved . . . ." (*People v. Green* (1983) 146 Cal.App.3d 369, 378 [194 Cal.Rptr. 128].)

In this case, Labaer was charged and found guilty of the third type of arson: the burning of a "structure or forest land." (§ 451, subd. (c).) Section 450, subdivision (a) states that for purposes of the arson statutes, " 'Structure' means any building, or commercial or public tent, bridge, tunnel, or powerplant." The trial court · instructed the jury on this definition. The prosecutor's theory was that the mobilehome was a "structure" because it was a "building." The Penal Code does not define "building" for purposes of arson; we therefore apply the plain meaning of the word. (*People v. Jasso* (1994) 25 Cal.App.4th 591, 595 [30 Cal.Rptr.2d 572].)

Labaer does not dispute that the mobilehome—as it existed during the months before the fire—constituted a "building" under the arson statutes. The evidence established the home was fixed to a particular location, could not be readily moved, and had been used as Labaer's residence for several months. Labaer argues instead that the dilapidated condition of the home on the day of the fire—caused primarily by his illegal dismantling activities the previous day—converted the mobilehome from a "structure" under section 451, subdivision (c) to generic "property" subject to lesser punishment under section 451, subdivision (d).

The easy answer to this contention is that the Legislature could not have intended that a criminal defendant benefit from his or her unlawful activities to obtain a lesser punishment merely by attempting to take apart a building shortly before setting it on fire. The more lengthy—but equally correct—response to Labaer's contention is that despite his dismantling activities, the mobilehome remained a "building" within the meaning of the arson statute because the dismantling was never completed. Although the mobilehome was in a substantially substandard condition, there was ample evidence showing it remained a standing and constructed structure that had four sides and a partial roof.

In this respect, Labaer's argument that the home no longer had walls or a roof does not accurately reflect the record. Four witnesses testified concerning the nature of the mobilehome's exterior. Although each witness had a slightly different opinion on the subject, the evidence showed that the mobilehome did have some form of exterior walls and at least a portion of a roof.

The auctioneer testified that after Labaer's dismantling activities there "absolutely" were walls on the mobilehome: "the front was still there. The front door, the sides, [and] the roof to the front [portion] of the mobile home [were] still there . . . ." He stated that someone could walk into the home and be shielded from the sun, rain, and wind. He explained that the roof fully covered one of the two parts that composed the double-wide mobilehome.

The storage park manager testified that after the sale she viewed the outside of the mobilehome and walked through the inside of the home. She said, "the outside of the mobile home mostly looked pink because of insulation, and it had been out in the weather and the insulation was kind of drooping off of it, and there were studs, and there was no siding on the double-wide. There were windows, doors. In places, there was plastic or visqueen over the outside . . . . [¶] . . . [¶] There were some stairs in the north side . . . leading into a doorway, or a door, that was on the north side. There were windows along the east side. I think on the south side there was plywood . . . instead of just insulation, there was plywood on there as well."

Jeffrey Funk, the neighboring commercial nursery manager, testified, "[t]here were no walls on it, really. It was an open mobilehome. Looked unfinished, actually." In response to the court's question as to what he meant by "open," Funk stated, "[t]wo-by-four framing. No plastic, no outside wall." Funk later clarified that there was two-by-four wood framing around the entire mobilehome, and that at least two sides were covered by "plastic sheeting." Funk testified that a roof covered the entire home, but admitted he could only see two sides of the mobilehome.

The arson investigator, who viewed the mobilehome only after the fire, testified that the structure did not appear to "have any walls to it [before the fire]. What was used on it was a plastic visqu[een] that looked like it was used to shield or give some sort of shielding from the weather, which is a little unusual. It looked like it was either under construction or being torn down . . . ." He also confirmed that the mobilehome had only one-half of a roof before the fire.

Viewing this evidence in the light most favorable to the prosecution (*People v. Hatch* (2000) 22 Cal.4th 260, 272 [92 Cal.Rptr.2d 80, 991 P.2d 165]), the jury could have reached certain reasonable conclusions regarding the mobilehome. First, it appears reasonably clear that although the mobilehome did not have four solid walls, it had four "sides," and each of these sides was enclosed by some material—two-by-four open wood framing and/or plastic visqueen sheeting with studs and insulation. Second, it was essentially undisputed that although the home did not have a full roof, an aluminum or light metal roof covered at least one-half of the mobilehome, the front section that contained the bedroom. Third, despite this unfinished-looking exterior, the mobilehome's interior was largely intact. A solid middle wall divided the double-wide mobilehome lengthwise. Stairs led to the front door, and the mobilehome had a particleboard floor. The home contained furniture and other accessories, including a bed, desk, dresser, lounge, and fish aquarium.

On this factual record, there was sufficient evidence for the jury to conclude this partly disassembled mobilehome was a "structure" within the meaning of section 451, subdivision (c). To constitute a "structure," the statute does not require a finished or completed building. Although there was conflicting testimony, the jury was entitled to find the testimony credible that the mobilehome had four sides and one-half of a roof, and that the building would provide shelter from the elements. Viewed from this perspective, the mobilehome certainly was a "building," rather than razed property. Further, although in its partially disassembled state the mobilehome may not have been appropriate for habitation, the subdivision does not require a building be inhabited or be capable of being inhabited before it may constitute a structure. (Compare § 451, subd. (b) with § 451, subd. (c).)

Although there are no California reported cases on the meaning of a "building" for purposes of the arson statutes, decisions in other states support our conclusion. For example, in one Maryland case, the subject of the arson was "a 20-year-old shell of an unused clubhouse, primarily of '[s]teel skeleton construction with a frame flooring interior and bearing walls with a built up roof.' The windows . . . had been removed or broken,

utilities had been turned off, copper piping removed and the interior severely vandalized." (*Brown v. State* (1978) 39 Md.App. 497 [388 A.2d 130, 133], reversed on other grounds in *Brown v. State* (1979) 285 Md. 469 [403 A.2d 788].) Notwithstanding the rundown condition of the clubhouse, the court rejected the defendant's argument the property was not a "building" as used in the Maryland arson statute. (388 A.2d at pp. 133-135.) The court reasoned that "[d]ilapidated or not, used or unused, the 'clubhouse' still stood, and the evidence further demonstrated that its steel-framed walls and roof had, just months prior to the burning, been used for the storage of various persons' property. Such standing structures fall under the protection of our statute, and their unlawful burning is proscribed despite their present, past or future purpose. If the Legislature intended to restrict the protection of buildings to those 'in use' or those with a contemporaneous intended use, it could more easily have added such clarifying words than can we in retrospect, and with far more right to have done so." (*Id.* at pp. 134-135.)

The facts here are similar. The mobilehome was still a standing structure and effectively served as a storage space for Labaer's various personal items. Despite the dilapidated condition of its exterior, the mobilehome was built property with four sides and a partial roof; individuals could enter the mobilehome and walk through its interior. The fact that portions of the walls were open (the interior was visible through the two-by-four wooden framing) does not mean the building was no longer a building. There is nothing in the applicable statutes supporting that the Legislature intended a structure be fully covered or of a particular quality before it could fall within the definition of a "building."

In contending the mobilehome property was not a "building," Labaer relies primarily on the burglary statutes. This reliance is misplaced.

First, the arson statutes specifically provide that the definition of a "structure" has the stated meaning "[i]n this chapter." (§ 450.) The burglary statutes are contained in an entirely separate chapter and therefore judicial interpretations of these statutes are not applicable.

Additionally, the analogy is not helpful because the legislative intent underlying the arson and burglary statutes is different. Because the burglary statutes are designed to protect against *unauthorized* entry, courts construing these statutes focus on whether the structure was such that a reasonable person would believe the property afforded a "reasonable expectation of protection from invasion." (*People v. Nible* (1988) 200 Cal.App.3d 838, 844 [247 Cal.Rptr. 396]; see *People v. Brooks* (1982) 133 Cal.App.3d 200, 204 [183 Cal.Rptr. 773].) The same principle does not apply in interpreting the

arson statutes. The "structure" element in section 451, subdivision (c) was not intended to impose a higher punishment merely because the property owner has reflected an intention to keep others out. Instead, its purpose is to distinguish between those types of property for which a fire would create a higher potential of injury to human life. (*People v. Green, supra,* 146 Cal.App.3d at p. 378.) Because a building, such as the mobilehome here, is capable of holding persons within its interior, a fire would be much more likely to create a higher potential for bodily injury than a fire to other types of property falling within section 451, subdivision (d).

Further, even assuming we apply the definition of "building" applicable to the burglary statutes, the mobilehome here would satisfy this requirement.

A person commits burglary when he or she "enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse *or other building,* tent, vessel . . . trailer coach . . . any house car . . . inhabited camper . . . ." (§ 459, italics added.) Under this statute, a building is generally defined to mean a place that has walls on all sides and is covered by a roof. (*In re Amber S.* (1995) 33 Cal.App.4th 185, 187 [39 Cal.Rptr.2d 672]; *People v. Brooks, supra,* 133 Cal.App.3d at p. 204.) But "[w]hat comprises four walls and a roof has been broadly construed." (*Brooks,* at p. 205.) The walls, in whatever form, must provide a significant barrier to entrance without being cut or broken. (*Id.* at p. 206.) The composition of the walls is not an important factor. (*People v. Buyle* (1937) 22 Cal.App.2d 143, 148 [70 P.2d 955].) A building is " 'a structure which has a capacity to contain, and [is] designed for the habitation of man or animals, or the sheltering of property.' " (*Id.* at pp. 148-149.) The Legislature intended the broadest possible interpretation of "building" to be used in the context of the burglary statutes. (*People v. Brooks, supra,* 133 Cal.App.3d at p. 204.)

As discussed, Labaer's mobilehome had four sides, as well as a middle wall. In addition, a roof covered at least one-half of the home. The law of burglary treats Labaer's mobilehome, made of two-by-four framing, plastic and insulation, the same as if it were made of different material, such as brick or plaster. Because chicken wire and a chain link fence have satisfied the requirement of walls, two-by-four wood studs and/or plastic and insulation similarly satisfy the requirement in this case. (*People v. Brooks, supra,* 133 Cal.App.3d at p. 205.) Therefore, even if we applied the definition of a building under the burglary statutes, Labaer's mobilehome would qualify under section 450.

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The sentence on counts 3 and 4 (§ 243, subd. (b), battery on a peace officer) is vacated, and the matter is remanded for resentencing on those counts. After resentencing, the clerk of the superior court shall prepare and send to the Department of Corrections a corrected abstract of judgment. In all other respects, the judgment is affirmed.

Kremer, P. J., and Benke, J., concurred.

*See footnote 1, *ante*, page 289.